# In the United States Court of Federal Claims

No. 10-680

(Filed: July 5, 2011)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| INDIAN HARBOR INSURANCE CO., | |
| *Plaintiff*, | Statutory interpretation; Section 330 of the National Defense Authorization Act of 1993; Base Realignment and Closure; environmental contamination; indemnification |
| v. | |
| THE UNITED STATES, | |
| *Defendant*. | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Scott A. Schipma* and *David C. Romm,* Washington, D.C., for plaintiff.

*David D'Alessandris*, United States Department of Justice, Civil Division, Washington, D.C., for defendant.

_____

OPINION

_____

BRUGGINK, *Judge*.

Plaintiff seeks reimbursement from the government for environmental cleanup costs incurred by the developers of property formerly used as a military base. Currently before the court is defendant's motion to dismiss in part or, in the alternative, for partial summary judgment,[1] pursuant to Rules 12(b)(1), 12(b)(6), and 56 of the Rules of the United States Court of Federal Claims

---

[1] When filed, the government's motion was directed at the whole of plaintiff's complaint. Subsequent discovery led to a revision of plaintiff's second claim, which the government now concedes is not subject to dismissal or summary judgment. Accordingly, the motion, and our ruling here, is restricted to the first count of plaintiff's complaint.

("RCFC"). The motions are fully briefed and we heard oral argument on June 20, 2011. For the reasons explained below, we grant defendant's motion.

FACTUAL BACKGROUND[2]

For more than 50 years, the United States, acting through the Department of the Navy, operated Marine Corps Air Station Tustin, a military base in southern California. In the early 1990s, the base was scheduled for realignment and closure. The City of Tustin, California, was designated as the Local Redevelopment Authority tasked with preparing a plan to receive, reuse, and develop the former base. The base was officially closed in 1999.

A significant part of the base closure and transfer process involved concern about possible environmental contamination. To facilitate the closure process and address these concerns, the Navy formed a cleanup team to evaluate the base, oversee environmental investigation and cleanup, and make the property suitable for transfer. This team included representatives from the Navy, the federal Environmental Protection Agency, and state and local environmental agencies. These efforts culminated in a number of written reports and findings that the property was suitable for transfer.[3]

In early 2002, the Navy conveyed portions of the base to the city via several quitclaim deeds, two of which—Quitclaim Deeds C and D—are relevant here. Both deeds contained covenants, mandated by law, which guaranteed that all necessary remedial action had been or would be taken by the government. These covenants were to run with the land and inured to the benefit of subsequent landowners. In addition, the deeds explicitly recognized the government's statutory duty to indemnify the recipients of former military lands in certain situations involving environmental contamination:

---

[2] The facts, which are uncontroverted unless otherwise noted, are taken from plaintiff's response to defendant's requests for admissions, the complaint, and the attachments to the parties' filings.

[3] Though not directly relevant here, these reports included a Finding of Suitability for Transfer, issued by the Navy, which refers to an Environmental Baseline Survey and discusses environmental conditions on the property. In addition, the city adopted a Final Joint Environmental Impact Statement/ Environment Impact Report that was subsequently approved by the Navy in a Record of Decision.

> 2.7 **Indemnification Regarding Transferees**. The GRANTOR hereby recognizes its obligations under Section 330 of the National Defense Authorization Act of 1993 (Pub. L. 102-484), as amended, regarding indemnification of transferees of closing Department of Defense Properties.

Def. Mot. to Dismiss, App. 2 at 88; *id.* App. 1 at 7.

Pursuant to its development plan, the city subsequently transferred certain parcels of the former base to two redevelopment companies: Vestar/Kimco Tustin LP ("Vestar") and Tustin Legacy Community Partners ("TLCP"). The parcels conveyed to Vestar included those originally conveyed to the city via Quitclaim Deed C; the parcels conveyed to TLCP included those originally conveyed via Quitclaim Deed D. Both TLCP and Vestar were insured by Indian Harbor Insurance Company ("Indian Harbor") for, among other things, environmental remediation expenses.

In May of 2006, Vestar discovered 1,1 dischloroethene ("1,1 DCE") contamination, which it alleges was caused by the Navy's prior military operations. Indian Harbor notified the Navy in both June and July of 2006 of the potential contamination and requested that the Navy investigate whether additional remediation was necessary.[4] In addition, the July notice requested that the Navy approve of the construction of a system of cut-off walls designed to prevent the contamination from migrating. Two months later, apparently prior to any official response from the Navy, Vestar complied with the orders of the California Environmental Protection Agency Division of Toxic Substance Control ("DTSC") to install cut-off walls and certain other construction methods to mitigate the spread of the material. Indian Harbor claims to have reimbursed Vestar approximately $350,000 for expenses arising from this remedial action.

In August 2007, contractors discovered petroleum contamination in the soil on TLCP's property and shortly thereafter alerted the Navy. The next month, TLCP entered into a Voluntary Cleanup Agreement with the DTSC, which provided for the DTSC to oversee the management of any removal

---

[4] The government neither confirms nor denies the factual allegations concerning the investigation and response to the 1,1 DCE contamination. It has presented no argument or evidence, however, tending to dispute the facts alleged by plaintiff.

efforts at the site and for TLCP to reimburse the DTSC for its oversight costs. The agreement explicitly did not release TLCP from any civil or criminal liability arising from the contamination, nor did it limit the DTSC's future authority to act or respond to the site contamination. In addition, the agreement reiterated TLCP's ongoing obligation to comply with all laws, regulations, and any other agencies' orders. Both TLCP and the DTSC reserved the right to unilaterally terminate the agreement for any reason.

In May of 2008, the California Regional Water Quality Control Board ("RWQCB") contacted TLCP regarding the soil contamination found on its property. The RWQCB noted that gasoline, jet fuel, and more than a dozen other chemicals had been detected that could imperil the groundwater supply. The letter stated that "[e]nforcement action can be taken for failure to cleanup and abate waste discharges" and that "contamination at the site must be fully characterized, and appropriate remedial action must be taken." Compl. Ex. A. The letter noted that the RWQCB was aware of the management plan and agreement already in place with the DTSC and deferred to the DTSC's continuing oversight and review pursuant to the voluntary agreement.

TLCP submitted its site management plan to the DTSC for approval in August of 2009. The DTSC formally approved the plan, noting that it complied with the requirements of the voluntary cleanup agreement between the parties. Over the next year, TLCP completed the majority of its remediation efforts. To date, Indian Harbor claims to have reimbursed TLCP more than $5.3 million for remediation of petroleum contamination.

Indian Harbor requested indemnification from the Navy in a letter on July 31, 2009. In response, the Department of Defense ("DOD") requested copies of all relevant insurance policies issued by Indian Harbor to Vestar and TLCP upon which the subrogation claim was based. After several exchanges debating what documents were needed and why, Indian Harbor advised DOD that it believed all the requested documents had been provided and requested a final decision on its claim within 30 days. On April 14, 2010, DOD denied Indian Harbor's request for indemnification. Six weeks later, Indian Harbor sought reconsideration of the decision and provided a full copy of the relevant insurance policies. DOD denied the request for reconsideration. Indian Harbor filed suit here on October 8, 2010, seeking $350,265.48 plus interest for breach of deed covenants related to Vestar's property[5] and $5,331,872.09 plus interest

---

[5] Count II of the original complaint alleged two related causes of action for the Vestar deeds: (1) that the government had failed to incorporate the

for TLCP's property pursuant to Section 330 of the National Defense Authorization Act of 1993, Pub. L. 102-484, 106 Stat. 2315, 2371 (hereinafter "Section 330").[6]

## DISCUSSION

We have jurisdiction under the Tucker Act over "claims against the United States founded . . . [on] any Act of Congress . . . or upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1) (2006). This statute itself, however, "does not create any substantive right enforceable against the United States for money damages." *Litzenberger v. United States*, 89 F.3d 818, 820 (Fed. Cir. 1996). Rather, the Tucker Act merely confers jurisdiction upon the court where a substantive right exists. *See United States v. Testan*, 424 U.S. 392, 398 (1976). Thus, a plaintiff alleging jurisdiction under the Tucker Act must also ground his claim on a contractual relationship, constitutional provision, federal statute, or executive agency regulation that provides a substantive right to money damages. Here, Indian Harbor asserts claims to money damages based on a federal statute and contractual rights.

The government's motion is brought pursuant to RCFC 12(b)(1), 12(b)(6), and 56, but does not specify which of these apply to Indian Harbor's first claim for damages pursuant to Section 330.[7] It seems clear, however, and neither party disputes, that we have subject matter jurisdiction over a suit

---

mandatory covenants in each of the multiple quitclaim deeds, thus violating 42 U.S.C. § 9620(h) (2006), and (2) that the government had, in any event, not complied with its obligations under those deed covenants. Subsequent discovery revealed that the covenants had been incorporated into every deed. Thus, on June 29, 2011, plaintiff amended its complaint to clarify Count II.

[6] TLCP's property was subject to the same deed covenants as Vestar's, pursuant to the mandate found in Section 120(h) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 codified at 42 U.S.C. § 9620(h). Plaintiff concedes that these covenants, however, do not apply to petroleum contamination. Hence plaintiff does not pursue its deed covenant claims as to TLCP's property.

[7] The government concedes that what remains of Count II—the claim for violation of the deed covenants—is not at this time vulnerable to a motion to dismiss or for summary judgment. Accordingly, we do not now deal with Count II, which survives this opinion.

brought under Section 330. Rather, the issue here is whether, on the facts of this case, Indian Harbor has stated a claim upon which relief can be granted. Accordingly, we conduct our analysis pursuant to RCFC 12(b)(6). A mere "formulaic recitation of the elements of a cause of action" is insufficient to survive a motion to dismiss for failure to state a claim. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, "the complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." *Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009) (quoting *Twombly*, 550 U.S. at 557).

I.   Section 330

Indian Harbor's first claim is for reimbursement pursuant to Section 330 for the remediation expenses incurred by TLCP and paid by Indian Harbor. Section 330 is an uncodified provision in a 1993 defense authorization act that provides for the DOD to indemnify the subsequent owners of former military bases against certain claims arising from environmental contamination:

> (a) In general.—(1) Except as provided in paragraph (3) and subject to subsection (b), the Secretary of Defense shall hold harmless, defend, and indemnify in full the persons and entities described in paragraph (2) from and against any suit, claim, demand or action, liability, judgment, cost or other fee arising out of any claim for personal injury or property damage (including death, illness, or loss of or damage to property or economic loss) that results from, or is in any manner predicated upon, the release or threatened release of any hazardous substance, pollutant or contaminant, or petroleum or petroleum derivative as a result of Department of Defense activities at any military installation (or portion thereof) that is closed pursuant to a base closure law.

Section 330(a)(1). The right to indemnification extends to any persons or entities that acquire ownership or control of land formerly used as a military installation. Section 330(a)(2). This includes states, state agencies, political subdivisions of a state, and any successor, assignee, transferee, lender, or lessee. *Id*. Indemnification is not available to entities who contributed to the release of the hazardous contaminants. Section 330(a)(3).

Section 330 imposes several further conditions, refusing to indemnify a person or entity unless it timely notifies the DOD, provides copies of pertinent papers it receives, furnishes evidence and proof needed, and provides access to

records and personnel for purposes of defending or settling the claim. Section 330(b). For purposes of timely notifying the DOD, a claim accrues on "the date on which the plaintiff knew (or reasonably should have known) that the personal injury or property damage" was caused by a hazardous substance as a result of DOD activities." Section 330(d). Finally, Section 330 notes that it does not affect other environmental response and compensation statutes: "Nothing in this section shall be construed as affecting or modifying in any way section 120(h) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9620(h))." Section 330(e).

The government moves for dismissal of Indian Harbor's Section 330 claim on two grounds. First, it argues that the directives of state environmental agencies, namely the DTSC and RWQCB, do not constitute a cognizable "claim" under Section 330(a)(1). Second, the government argues that Indian Harbor's initial refusal to divulge its complete insurance contract with TLCP runs afoul of Section 330(b)'s requirement to furnish pertinent papers, evidence, and records.

II.   <u>Cognizable claims under Section 330</u>

The resolution of Indian Harbor's claim for indemnification turns on an issue of statutory interpretation, namely, what constitutes "a claim for personal injury or property damage" which triggers the government's duty to indemnify under Section 330. Specifically, we must determine whether the instructions and requirements of two state agencies that TLCP remediate its own property, together with a voluntary agreement to do so—albeit under threat of potential sanction—fall within the ambit of Section 330. For the reasons explained below, we conclude that Section 330 does not apply to such a scenario, and that Indian Harbor has thus failed to present a claim upon which relief may be granted.

   *A.   Plain language*

We begin with the plain language of the statute. *Engine Mfrs. Assn. v. South Coast Air Quality Management Dist.*, 541 U.S. 246, 252 (2004) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.") (internal quotation marks omitted). Section 330 requires the DOD to defend and indemnify any person or entity who acquires ownership or control of a former military facility. The statute shields such persons from a variety of potential exposures, including "any suit, claim,

7

demand or action, liability, judgment, cost or other fee *arising out of any claim for personal injury or property damage*" that is predicated on the release or threatened release of hazardous material. Section 330(a)(1) (emphasis added). The interpretation of this language is the key issue here. More specifically, whether the demand[8] by state regulators that the developer remediate the pollution constitutes a "claim for personal injury or property damage."

Though the statute does not define its terms or provide any further guidance, several things seem relatively clear. First, indemnification is not required in every scenario, but only in certain situations and subject to various conditions. Second, the statute contemplates a situation in which the owner or developer of a former military property is subject to some action brought against him. This seems self-apparent at a first reading of the statute, which would be more simply worded if Congress had intended to reimburse *all* remediation expenses regardless of why incurred. A closer parsing merely confirms this initial impression. Specifically, the statute uses adversarial terms and concepts (*e.g.*, suit, claim, demand, etc.), which are directed by one party against another, and mandates that the government shall "defend[] and indemnify" the landowner "from and against" such actions. This clearly implies a third party bringing an action against the owner or developer.

Third, in our view, which plaintiff does not contest, the statute requires that the action brought by the third party against the landowner must be rooted in a "claim for personal injury or property damage." Stated differently, a third-party claim for personal injury or property damage is a necessary predicate for indemnification under Section 330. Although a variety of procedural devices can trigger indemnification—a suit, claim, demand or action, liability, judgment, cost or other fee—they all share a common genesis. They must arise "out of any claim for personal injury or property damage." Linguistically, this final clause modifies each of the enumerated nouns that precede it in the statute. In other words, regardless of how the third-party allegation is denominated (a suit, claim, action, etc.) and regardless of how fully developed it is (a mere demand or a judgment), it must arise from a claim for personal injury or property damages.

Finally, we believe a straightforward reading dictates that the action brought by the third party must allege injury to *that* person or damage to *his*

---

[8] By using the term "demand," we believe we are giving plaintiff the benefit of the doubt by selecting the least formal of the nouns used in the statute.

property. For example, Section 330 would unquestionably apply to a property developer who was sued by a downstream farmer whose water supply had been contaminated by toxic runoff from the developer's land. Similarly, the statute would apply to a residential developer of a former base who received a demand letter from home buyers subsequently diagnosed with cancer. We do not believe, however, that this statute reimburses a developer who must clean up its *own* lands that were insufficiently remediated by the government prior to transfer. In sum, based on the plain language of the statute, we conclude that Section 330 requires indemnification only when an entity with ownership or control of a former military base is subject to a third-party proceeding arising from an injury to that third party or damage to its property as a result of hazardous substances released or used by the military on the former base.

    *B.*    *Legislative history*

Our interpretation of the plain language is unswayed by the legislative history on which plaintiff relies. As a general matter, "reference to legislative history is inappropriate when the text of the statute is unambiguous," *Dept. Of Housing and Urban Dev. v. Rucker*, 535 U.S. 125, 132 (2002), and we do not believe it necessary to rely on the legislative history here. *See Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 395-396 (1951), Jackson, J. concurring ("Resort to legislative history is only justified where the face of the Act is inescapably ambiguous . . . . [T]o select casual statements from floor debates, not always distinguished for candor or accuracy, as a basis for making up our minds what law Congress intended to enact is to substitute ourselves for the Congress in one of its important functions."). In any event, the scant legislative history here does not persuade us that our interpretation of the statute should be any different.

Indian Harbor relies upon statements made by Senator McCain that indicate his concern that recipients of former military lands could be sued for contamination previously caused by the government and his belief that the government should be responsible for all environmental remediation on former military lands. *See* 138 Cong. Rec. S13982-01, S14009. He indicated his desire "to fully shield purchasers of closed military bases from liability for hazardous waste left by the Federal Government." *Id.* While Senator McCain's intentions are clear enough, they are of limited usefulness in resolving the issue here. Specifically, his comments were about a version of Section 330 that did not contain the requirement of a "claim for personal injury or property damage," a clause that was subsequently added to the bill by the conference committee. Indeed, he commented that his previous attempts to introduce broad

indemnification had been circumscribed by congressional committees, and it seems that his efforts were similarly thwarted here. Accordingly, we find Senator McCain's comments to be of little help in divining the specific meaning of this particular statute and insufficient to overcome the plain meaning of the text.

### C.   State agency "claims"

Having determined that Section 330 requires a third-party claim for personal injury or property damage, we must determine whether the orders and oversight by state environmental agencies, such as the DTSC and RWQCB, constitute such claims and require the government to indemnify the developer for costs incurred complying with such agency orders. For the reasons explained below, we conclude that the agency actions here were not claims within the meaning of Section 330.

Indian Harbor argues that the orders and actions of the DTSC and RWQCB constitute third-party personal injury or property damage claims under Section 330. First, it notes that the state, acting on behalf of and in the interests of its citizens, may regulate to prevent injury to its citizens or damage to their property. For example, California's water laws are premised on the idea "that the people of the state have a primary interest in the conservation, control, and utilization of the water resources of the state."[9] Cal. Water Code § 13000. Plaintiff next points out that Section 330 applies to both actual and "threatened release" of contaminants. Thus, plaintiff argues, state agencies may act preemptively to prevent personal injury or property damage by ordering cleanup of environmental contamination. Such an act, according to plaintiff, qualifies as an action (or at least a demand), with resulting costs and fees, that arises from a claim for personal injury or property damage under Section 330.

We understand plaintiff's argument but find its logic too tenuous and its reasoning too contorted to persuade us that it is a viable interpretation of Section 330. As already explained, the statute envisions a claim by a third party alleging damage to its own person or property. Here, the state *qua* state has not been harmed in its person or property nor does it appear threatened by future speculative harm. We recognize that a state may act to preserve the health and safety of its citizens, but doing so does not put the state in their shoes to act as

---

[9] Plaintiff relies on this language for its assertion that groundwater is "a natural resource belonging to the people of California." Pl. Resp. 18. We think this is an overstatement of the statutory language.

subrogee to potential personal injury or property damage claims. We believe there is a distinction between a state enforcing a generally applicable environmental regulation pursuant to its police power and, as plaintiff argues is the case here, the state bringing a legal claim *ex rel* its citizens. Here, the state engaged only in the former. In short, we do not believe any possible reading of Section 330's requirement of a "claim for personal injury or property damage" can encompass a state's exercise of its police power through environmental regulation.

We recognize that our interpretation and application of Section 330 is contrary to *Richmond American Homes of Colorado, Inc. v. United States*, 75 Fed. Cl. 376 (2007), which held that a state environmental agency's Compliance Advisory constituted an indemnifiable claim under Section 330. The facts of *Richmond*, notwithstanding the government's attempt to distinguish them, are markedly similar to those here. We disagree, however, with *Richmond's* holding.

The *Richmond* court began its analysis by examining the base realignment and closure context, quoting extensively from the legislative history. When the court subsequently turned to the text of Section 330, it found that the requirement of a third-party suit was incompatible "with the broad exposure urged by Senator McCain and feared by [the DOD]." *Id.* at 390. In the alternative, the court noted that even if the statute did require a third-party claim, "the statutory language easily accommodates a claim by a state alleging an environmental hazard." *Id.* at 391. Because the statute uses a "broad range" of "descriptive terms," the court found there was "no indication that Congress intended to limit the type of property damage" claimed, and that preventative measures like the state agency directive "are contemplated by this legislation." *Id.* at 394.

We respectfully disagree with *Richmond's* holding, which is premised upon the "context" and intent surrounding the base closure scheme, as opposed to the text of Section 330 itself. While the intent perceived by Senator McCain and the *Richmond* court may be admirable, it is, in our opinion, without basis in the text of Section 330. As explained in greater length above, we believe the statute clearly contemplates liability only in instances of third-party actions arising from personal injury or property damage to that third party or its property. The statute nowhere indicates that a developer is to be reimbursed for all costs it incurs while remediating contamination, even if those costs are

11

pursuant to state regulations.[10] We recognize that this statute may have the unfortunate effect of hindering base closure and transfer. If so, Congress may amend the law.

In contrast to *Richmond*, and in accord with our view, is another decision of this court and a similar one by the Armed Services Board of Contract Appeals ("ASBCA"). In *American International Specialty Lines Insurance Company v. United States*, No. 05-1020, 2008 WL 1990859 (Fed. Cl. Jan. 31, 2008) ("*AISLIC*"), the court confronted facts and claims nearly identical to those presented here and concluded that an order by the DTSC to perform remediation was not a claim cognizable under Section 330. Like our analysis here, the *AISLIC* court began by examining the plain language of the statute and determined that it was triggered only by a third-party action arising from a claim for personal injury or property damage. Because such claims "ordinarily entail legal demands for money damages," *id.* at *30, the court held that the letter from the DTSC requiring remediation was not a claim.[11]

---

[10] We note, however, that another statute, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), provides a comprehensive scheme for recovery of remediation costs. Though not applicable to petroleum products, CERCLA provides for governmental liability for pollution, including at former military bases. *See United States v. Shell Oil Co.*, 294 F.3d 1045, 1053 (9th Cir. 2002) ("[T]he United States has repeatedly been held liable under CERCLA . . . . The clearest example is the United States' immense CERCLA liability for cleanups associated with military installations and activity."); *FMC Corp. v. Dept. of Commerce*, 29 F.3d 833, 840 (3d Cir. 1994) ("[T]he government is liable for clean up of hazardous wastes at military bases . . . .") (citing *United States v. Allied Corp.*, Nos. C-83-5898-FMS and C-83-5896-FMS, 1990 WL 515976 at *2-3 (N.D. Cal. Apr. 25, 1990)).

[11] The court in *AISLIC* construed the word "plaintiff" in Section 330(d) to refer to the third-party bringing the action against the landowner or developer and relied on that analysis to reach the conclusion that a legal demand for money damages is necessary to trigger Section 330. *See AISLIC*, 2008 WL 1990859 at *30 n.24 and accompanying text. We believe it more likely that the word "plaintiff" refers to the party seeking indemnification. Nor do we think it necessary that the demand must be for monetary damages as opposed to, for example, equitable relief. In any event, despite this minor disagreement, we agree with *AISLIC's* ultimate conclusion that a third-party

Similarly, in *New London Dev. Corp.*, ASBCA No. 54535, 05-2 ¶ 33018 (2005), the ASBCA, interpreting a contractual provision that closely tracked the language of Section 330, concluded that any claim for indemnification must arise from a claim for personal injury or property damage. The Board found, however, that it was at least plausible that the landowner's remediation costs could be considered property damage and thus denied the government's motion to dismiss.

III.   Records required to be furnished by Section 330

The government also argues that Indian Harbor is not entitled to Section 330 indemnification because it failed to promptly provide copies of its insurance policy with TLCP. As noted above, Section 330 states that no indemnification shall be made unless the person or entity seeking indemnification "furnishes to the Department of Defense copies of pertinent papers the entity receives . . . [and] any evidence or proof of any claim, loss, or damages . . . [and provides] access to the records and personnel of the entity for purposes of defending or settling the claim or action." Section 330(b). In light of our interpretation and application of Section 330 above, this argument is rendered moot. Accordingly, we need not consider whether Indian Harbor's initial reluctance was a proper basis on which to refuse indemnification or whether the eventual full disclosure undercuts the governments argument on this point.

CONCLUSION

For the reasons stated above, we grant in part the government's motion to dismiss as to Count I of the complaint. Count II of the amended complaint, alleging a breach of deed covenants, is not subject to the pending motion to dismiss or for summary judgment. Accordingly, the parties are directed to confer and propose to chambers by July 20, 2011, a schedule for further proceedings in this matter.

s/ Eric G. Bruggink
Eric G. Bruggink
Judge

---

action is required to trigger DOD's obligation to defend, indemnify, and hold harmless under Section 330.